**SCHLEIER LAW OFFICES, PC**
3101 N. Central Avenue
Suite 1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

TOD F. SCHLEIER, ESQ. #004612
Email: tod@schleierlaw.com
BRADLEY H. SCHLEIER, ESQ. #011696
Email: brad@schleierlaw.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence O. Anderson, a married man,<br><br>Plaintiff,<br>v.<br><br>Uber Technologies, Inc., a Delaware corporation,<br><br>Defendant. | CV<br><br>**COMPLAINT** |

Plaintiff, Lawrence O. Anderson ("Plaintiff"), by his attorneys, for his Complaint alleges as follows:

## INTRODUCTION

1. This is an action to enforce the provisions of the American with Disabilities Act ("ADA") brought pursuant to 42 U.S.C. §§ 12181-12189 and, more specifically, 49 C.F.R. § 37.23. This action seeks to stop systemic civil rights violations committed by Uber Technologies, Inc. ("Uber") in the State of Arizona against mobility-impaired individuals who use wheelchairs and require wheelchair-accessible vehicles for their

transportation needs and other related accommodating services, such as, assistance with securing their wheelchairs during transportation. These mobility-impaired individuals who use wheelchairs and need vehicle-for-hire services have been, and continue to be, deterred and prevented from using Uber's UberX or other transportation services because Uber has failed to ensure that disabled riders in wheelchairs can access its transportation services.

2. Plaintiff brings this action requesting declaratory and injunctive relief against Uber to enforce the provisions of the ADA to ensure equal treatment under the law for wheelchair-bound consumers of vehicle-for-hire services.

3. Uber offers UberX and other transportation services to non-wheelchair bound individuals in Arizona. UberX is highly cost-effective and widely available. Uber uses mobile software applications to arrange rides between passengers and its fleet of UberX drivers.

4. In November 2014, Plaintiff contacted Uber to learn how he could order a wheelchair-accessible Uber ride. Uber advised Plaintiff that UberWAV (Wheelchair Accessible Vehicle) was not yet available in Phoenix. In the months that followed, Plaintiff continued to contact Uber about the availability of UberWAV in Phoenix, Arizona and was advised that, although such services were available in some cities in the United States, it was not yet available in Phoenix. Phoenix is the sixth largest city in the United States based upon population.

## JURISDICTION, VENUE AND PARTIES

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188(a) (1) for Plaintiff's claims arising under the ADA, 42 U.S.C. § 12101, *et seq*.

6. Venue is proper in the District of Arizona pursuant to 28 U.S.C. §§ 1391(b)-(c).

7. Plaintiff is a married man who has physical disabilities, is mobility impaired, and must use a wheelchair for mobility. As a customer of vehicles-for-hire, Plaintiff requires wheelchair-accessible vehicles for his transportation needs and other accommodating services. Plaintiff is disabled within the meaning of the ADA.

8. Uber is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Uber is doing business in the State of Arizona out of which Plaintiff's claims arise.

## THE ADA STATUTORY SCHEME COVERING DEMAND RESPONSIVE TRANSPORTATION SERVICES

9. Title III of the ADA prohibits discrimination on the basis of disability by a range of entities, including public accommodations and, as applicable here, private entities primarily engaged in providing transportation services. 42 U.S.C. §§ 12182, 12814. This latter category is covered by § 12184 of Title III, which is not contingent on an entity's status as a public accommodation.

10. The ADA and applicable regulations define coverage under 42 U.S.C. § 12184 to include most types of transportation provided by private companies. Section 12184

prohibits discrimination "[o]n the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). The terms "specified public transportation" are broadly defined as transportation by any "conveyance" (other than aircraft) "that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10).

11. Congress directed the Secretary of Transportation to issue regulations to implement Title III transportation provisions, including § 12184. Pursuant to this mandate, the United States Department of Transportation ("DOT") promulgated 49 C.F.R. Part 37 and accompanying guidance that explain DOT's construction and interpretation of its implementing regulation. 49 C.F.R. pt 37, app. D.

12. This DOT regulation broadly defines the types of transportation services subject to Tile III. The regulation and guidance provide that such services include providers of transportation services, like Uber, that are "private entities primarily engaged in the business of transporting people which provide demand responsive service." 49 C.F.R. § 37.29(a); 49 pt. 37, app. D § 37.29. The DOT regulation explains why such providers are covered by § 12184 of Title III - because they are "private entities primarily engaged in the business of transporting people which provide demand responsive services." 49 C.F.R. § 37.29(a). A "[d]emand responsive system means any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system." 42 U.S.C. § 12181(3); *see also*, 49 C.F.R. § 37.3.

13. In addition, the regulation defines what it means to "operate" a demand responsive system (or non-fixed route transportation system) as "[t]he provision of transportation service by a … private entity itself or by a person under a contractual or other arrangement or relationship with the entity." 49 C.F.R. § 37.3. Consequently, a private entity may operate a demand responsive system even if it does not itself provide transportation services, if it does so by a contractual or other relationship with another entity or persons. While an entity may contract out its transportation service, it may not contract away its ADA responsibilities. 49 C.F.R. pt. 37, app D. § 37.23; 49 C.F.R. § 37.23(d).

**UBER OPERATES A DEMAND RESPONSIVE SYSTEM**

14. Uber provides several different types of transportation services to members of the general public in a rapidly expanding number of metropolitan areas across Arizona and the United States. Uber's transportation services vary based on the type of vehicle providing transportation. UberX is one of Uber's most cost-effective transportation services. To use Uber's transportation services, a customer must create a user account, and provide Uber with his/her phone number, credit card information, and email address. Uber has developed mobile software applications for iPhones, android phones, and other smart phones that customers use to request transportation from Uber.

15. To use UberX transportation service, a customer submits a request through one of Uber's mobile software applications. Once Uber identifies the vehicle that will provide the customer with the transportation service, Uber notifies the customer either by text message or through its smart phone application. The notification includes the UberX

driver's name, customer rating, phone number, vehicle license plate number, make and model of the UberX vehicle, and the driver's estimated time of arrival. Uber's mobile application allows customers to track the UberX vehicle's location as the driver navigates to the customer. The customer may also submit his or her trip destination through Uber's mobile application.

16. Uber notifies the customer once his or her UberX vehicle has arrived. The customer may then board the vehicle. If the customer submitted his or her destination address to Uber, then Uber will supply the UberX driver with turn-by-turn directions to the customer's destination. If the customer did not enter the destination into Uber's application, the customer must provide the driver with his or her destination. The driver then starts the fare meter in the Uber software application and proceeds to the customer's destination. When the customer arrives at his or her destination, the driver ends the trip in the Uber smart phone application.

17. Uber exclusively controls who may provide its UberX transportation service. Individual drivers who wish to provide UberX transportation services must comply with Uber's driver requirements - take an exam, undergo a criminal background check, undergo a driving record check, present his or her driver's license, vehicle registration, and automobile insurance information, and complete various forms. Once Uber authorizes an individual to be an UberX driver, Uber controls which trip requests are transmitted to each of its UberX drivers. Uber also exclusively controls termination of UberX drivers, and routinely terminates its drivers for various reasons, including, but not limited to, poor ratings from Uber's customers.

18. Uber exclusively controls who uses the UberX transportation service in the State of Arizona. Uber makes available the UberX service only to members of the public who have a valid credit card and smart phone to operate one of Uber's mobile applications and do not require a wheelchair for mobility. Uber requires its customers to create an Uber account, and request a ride through Uber's mobile application. Customers cannot access the UberX transportation service by physically hailing an UberX vehicle on the street.

19. Uber exclusively controls the UberX transportation drivers by, *inter alia*, setting detailed requirements for driver conduct and appearance. Uber establishes the requirements for the type and age of vehicles that drivers may use to provide the UberX transportation service. In addition, before an UberX driver may provide UberX transportation services in Arizona, the driver's vehicle must pass an inspection. Uber also mandates that UberX drivers refrain from smoking while providing UberX transportation services, and from asking customers to give them five-star ratings. Uber requires UberX drivers to either meet or beat the estimated time-of-arrival that Uber generates and provides to each customer. Uber instructs UberX drivers that the share-of-trip requests accepted through Uber's application should be consistently high, and UberX drivers may not accept street hails from potential passengers. Furthermore, Uber issues training and directives concerning other requirements to UberX drivers.

20. Uber closely monitors UberX drivers. Uber records many details about the transportation services that its UberX drivers provide, including for each trip: (1) the pickup location, (2) the time of pickup, (3) the drop off location, (4) the time of drop off,

(5) the distance traveled, (6) the trip route, (7) the trip duration, and (8) the customer's identity. Uber employees who supervise UberX drivers have easy access to this data. In addition, Uber periodically reviews the driving record of each of its UberX drivers. Uber also monitors its UberX drivers' performances by asking customers for written feedback after every ride that an Uber driver provides, and routinely follows up with Uber's customers who express dissatisfaction with Uber's transportation services. Furthermore, Uber regularly terminates or suspends UberX drivers whose average customer ratings falls below a certain threshold established and controlled by Uber.

21. Uber provides UberX drivers with supplies necessary to provide Uber's transportation services. Uber provides UberX drivers with iPhones loaded with Uber's smart-phone application. When providing Uber's transportation services, Uber's drivers use these smart phones to receive and respond to trip requests, receive GPS-based navigational guidance, record the beginning and end of each trip, communicate with customers, and cancel trips. Uber maintains general commercial liability insurance to cover claims concerning incidents that occur while drivers are providing UberX transportation services.

22. Uber exclusively controls payment for its UberX transportation services. Customers do not directly pay drivers who provide UberX transportation services. Instead, Uber automatically charges an Uber customer's credit card after he or she arrives at their destination. Uber has exclusive control over the fares that customers pay and the compensation that UberX drivers receive. Fares for Uber's transportation services are based on the duration and distance of each trip and other factors, such as, the demand at

the time and the place of the ride. Uber retains twenty percent (20%) of each fare. Uber compensates its UberX drivers based on the duration and distance of the trips that UberX drivers provide to customers. Customers who dispute the fare for a particular trip must contact Uber's customer service representatives to request an adjustment to their fares. Uber exclusively controls whether a fare or other charge is deleted or adjusted from a customer's credit card.

23. Uber closely monitors and controls the interactions between UberX drivers and Uber's customers. Uber decides which of its UberX drivers may transport each Uber customer. Uber specifies how quickly each driver should pick up each customer. After drivers pick up customers, Uber routinely provides UberX drivers with directions to customers' destinations and specifies driver conduct that is prohibited while UberX drivers transport customers. Moreover, Uber determines how much each customer must compensate each UberX driver for each trip, and Uber, not the UberX driver, provides each customer with a fare receipt for each trip. Uber's customers and drivers must communicate through Uber's mobile application. Uber records trip-related details about every trip that each UberX driver provides to each customer, and collects written feedback from every customer concerning the quality of each UberX driver's performance after every trip. Uber's customers who forget personal property in UberX vehicles must contact Uber to request assistance retrieving that property.

24. Uber controls and operates a demand responsive system because it provides transportation services by itself or drivers under a contractual or other arrangement or relationship with Uber. Uber's operations affect commerce.

**PLAINTIFF ATTEMPTS TO UTILIZE UBER**

25. As alleged above, Plaintiff is a mobility-impaired customer of vehicles-for-hire who requires wheelchair-accessible vehicles for transportation or other reasonable accommodations to, for example, run errands; attend meetings; travel to and from medical and dental appointments and sporting events; and access medical services.

26. In October 2014, Plaintiff had a discussion with a neighbor and friend concerning the use of Uber for transportation to and from an Arizona Cardinals game and how the Uber system operates.

27. On November 2, 2014, Plaintiff downloaded the Uber application on his iPhone and experimented with how it works, using a phone number, user number, and password. Plaintiff inadvertently ordered an Uber ride and received a call from an Uber driver. Plaintiff explained to the caller/driver he did not intend to order a ride and asked if he or Uber had a ramped vehicle to provide a ride for a wheelchair user. The driver responded "no," and Plaintiff cancelled the ride.

28. On November 2, 2014, Plaintiff wrote an email to Uber, explaining that he inadvertently ordered an Uber ride and asked if Uber would reverse the $4.00 charge on his credit card. Plaintiff also asked Uber to "tell me how I order a wheelchair accessible Uber ride." On that same date, Plaintiff received an email back from Uber's Jules A, who wrote that, *inter alia*, "uberWAV(Wheelchair Accessible Vehicle) in (sic) not available in Phoenix yet, but it's being expanded in to new markets. . . See you in an Uber soon."

29. On November 3, 2014, Plaintiff responded to Jules A's email, thanking her/him for deleting the $4.00 charge, advising that "I look forward to Uber adding UberWAV(Wheelchair Accessible Vehicle) to the Phoenix area[,]" and asking, "[i]f possible, could someone from Uber notify me when uberWAV(Wheelchair Accessible Vehicle) is added to the Phoenix market?"

30. On November 5, 2014, Jules A sent an email to Plaintiff, writing "[w]e always update our riders through their email if there's any new service in your area. You'll definitely receive this update if ever uberWAV is activated in Phoenix. You can also check our blog site for all Uber updates. Hope to see you in an Uber soon!"

31. On January 31, 2015, Plaintiff sent an email to Uber: "When will Uber have wheelchair accessible vans and comply with the ADA so those of us in wheelchairs can use your company's services? If and when you have such vans, can someone please call me?" On that same date, Uber's Rainer Mar Bacus responded: "Thanks for reaching out! For now, uberWAV is only available in specified places like Philadelphia, New York, San Diego and Los Angeles. *But we are doing our best to expand this service in United States*. Please visit our blog for future updates. If you have any other questions or concerns, please let me know. Best, Rainer UberSupport" (emphasis added).

32. On February 2, 2015, Plaintiff responded: "Ranier, Uber told me in 2014 that it was working on getting wheelchair vans. What has Uber done to find drivers and vans to comply with the ADA in the last 3 months?" On February 3, 2015, Ranier responded: "Hi Lawrence, Thanks for writing back! For now, we don't have any relevant dates when will uberWAV be available at Phoenix. *But we are working very hard to get*

*this service available in every state.* We'll post updates on our blog if it’s ready in Phoenix. If you have any other questions or concerns, please let me know. Best, Rainer UberSupport” (emphasis added).

33. Plaintiff then emailed Uber as follows: “Uber, I think I’ll be seeing [a] lawyer soon unless someone at Uber promptly gives me some specific information.” On February 14, 2015, Blaine (Uber) sent an email to Plaintiff: “Hi Lawrence, Thank you so much for reaching out, and sorry for the delay. A representative from Uber will be giving you a call to discuss your concerns. Thank you. Blaine”

34. During the week of February 16, 2015 or so, Plaintiff received a call on his iPhone from a female from Uber. Plaintiff does not recall if the caller gave her name and she denied she was an attorney. She did not provide any information that Uber was getting close to providing wheelchair-accessible Uber transportation in Phoenix. She inquired what Plaintiff did for transportation and Plaintiff told her he uses public transportation. She continued to ask Plaintiff questions about what he did for transportation. Plaintiff told her that what he did for transportation was not relevant, but what was relevant was what Uber was doing to provide wheelchair-accessible transportation in Phoenix. She then hung up. Plaintiff has not received any phone calls from Uber since then.

35. On March 5, 2015, Plaintiff received an email from Uber, announcing the new service uberSELECT in the Phoenix area. “[U]berSELECT offers an elevated experience at rates cheaper than a taxi and seats up to 4 passengers. With SELECT, you can expect a classy ride (think a BMW 3 Series, Mercedes-Benz C-Class, Lexus IS or an

Audi A4, among others) at an economical rate. To welcome this new, fresh option to town, we've partnered with our friends at Oakley to get you riding SELECT in style all over the Valley!"

36. Uber has failed to take adequate measures to remedy the discrimination against mobility-impaired individuals in wheelchairs such as Plaintiff and continues to discriminate against mobility-impaired individuals in wheelchairs in the State of Arizona.

**COUNT ONE**

**Violation of Title III of the American with Disabilities Act**

**(42 U.S.C. § 12101 *et seq*.)**

37. Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

38. Title III of the ADA prohibits discrimination "[o]n the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a) ("No entity shall discriminate against an individual with a disability in connection with the provision of transportation service."); 49 C.F.R. § 37.5(a), (f).

39. Plaintiff is a qualified individual with a disability within the meaning of Title III of the ADA.

40. Uber owns, operates, controls, or leases vehicles providing transportation service and specified public transportation within the meaning of Title III of the ADA and its regulations. 49 C.F.R. §§ 37.3, 37.23. The vehicles providing transportation

services owned, operated, controlled, or leased by Uber are places of public accommodation within the meaning of Title III of the ADA. 42 U.S.C. §§ 12181(10), 12184(a); 28 C.F.R. § 36.104.

41. Title III regulations prohibit private entities providing transportation services from discriminating by refusing to provide such services to people with disabilities who can physically access transportation vehicles. 42 U.S.C. § 12184(b)(4)(B); 49 C.F.R. §§ 37-5(a)-(b), (f), 37.23.

42. At all relevant times alleged herein, Uber has violated, and continues to violate, Title III of the ADA by refusing to provide transportation services to mobility-impaired individuals who use wheelchairs, including Plaintiff, whose wheelchair cannot physically access UberX vehicles. Uber therefore has violated, and continues to violate, Title III of the ADA by denying Plaintiff full and equal access to the services, facilities, privileges, advantages, and accommodations of vehicles providing the UberX or other transportation services.

43. Title III prohibits private entities, like Uber, providing specified public transportation from imposing eligibility criteria that screen out, or tend to screen out, individuals with disabilities from fully enjoying the specified public transportation services provided by such entities, unless the criteria can be shown to be necessary for the provision of the services being offered. 42 U.S.C. §§ 12184(b)(1), 12182(b)(2)(A)(iii); 28 C.F.R. § 36.302(a).

44. By operating a transportation service that dispatches drivers who unlawfully discriminate and refuse to transport mobility-impaired individuals in

wheelchairs, Uber has violated, and continues to violate, Title III of the ADA. Uber is utilizing eligibility criteria that screen out, or tend to screen out, Plaintiff and other mobility-impaired individuals in wheelchairs from fully enjoying Uber's transportation services. 42 U.S.C. §§ 12184(b)(1), 12182(b)(2)(A)(iii); 28 C.F.R. § 36.302(a).

45. Uber's actions and inactions alleged herein were, and are, in violation of the ADA, 42 U.S.C. §§ 12181, *et seq*., and the regulations promulgated thereunder. Uber has failed to take equitable steps to remedy its discriminatory conduct in the State of Arizona, and Uber's violations of the ADA in the State of Arizona are ongoing. Uber's unlawful actions and inactions deter Plaintiff and other mobility-impaired individuals in wheelchairs from attempting to access Uber's transportation services.

46. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged here and this suit for declaratory and injunctive relief is his only means of securing adequate redress from Uber's unlawful practices. Plaintiff has suffered, and will continue to suffer, irreparable injury from Uber's intentional acts, omissions, practices, policies, and procedure set forth herein unless enjoined by this Court.

47. Plaintiff is entitled to injunctive relief. 42 U.S.C. § 12188.

48. An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes, that Uber, by failing to provide access to the UberX or other transportation services to mobility-impaired individuals using wheelchairs in Arizona, fails to comply with applicable laws, including Title III of the ADA, 42 U.S.C. §§ 12181, *et seq*., prohibiting discrimination based on disability.

49. A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

WHEREFORE, Plaintiff demands judgment as follows:

1. A permanent injunction pursuant to the ADA, 42 U.S.C. §§ 12181, *et seq*., requiring Uber to take immediate steps necessary to ensure that Uber and Uber's drivers who provide Uber transportation services do not unlawfully refuse to transport mobility-impaired individuals in wheelchairs, including Plaintiff.

2. A declaration that Uber discriminates against mobility-impaired individuals in wheelchairs by failing to provide such individuals, including Plaintiff, with full and equal access to the services, facilities, privileges, advantages, and accommodations of Uber vehicles providing transportation services in violation of Title III of the ADA, 42 U.S.C. §§ 12181 *et seq*.

3. An order awarding Plaintiff reasonable attorneys' fees, litigation expenses, and costs, as authorized by 42 U.S.C. § 12205; and

4. For such other and further relief as the court deems appropriate.

DATED this 16th day of April, 2015.

SCHLEIER LAW OFFICES, P.C.

s/ Tod F. Schleier
Tod F. Schleier
Attorneys for Plaintiff